298 So.2d 85

**Major POOLE, Jr.**

v.

**STATE.**

**4 Div. 254.**

Court of Criminal Appeals of Alabama.

Jan. 15, 1974.

Rehearing Denied Feb. 12, 1974.

Major Poole, Jr., pro se.

William J. Baxley, Atty. Gen., and William T. Musgrove, Jr., Sp. Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of robbery and his punishment fixed at ten (10) years imprisonment in the penitentiary. At arraignment, attended by counsel, he interposed a plea of not guilty. He did not give notice of appeal at the time he was sentenced. Within the time allowed by law he gave written notice of appeal and requested a free transcript of the trial proceedings. This request was granted by the trial court who appointed one of his trial attorneys to represent him on appeal.

Subsequently, appellant filed a motion in the trial court for dismissal of his court-appointed lawyer but no action was taken on this motion. Appellant communicated with this attorney and informed him that he did not want him to represent him on appeal and further requested that the attorney dismiss his appeal. This attorney refused to dismiss the appeal but sent the transcript and his personal file to appellant who wrote a *pro se* brief which was filed with the Clerk of this Court on December 13, 1973. We will treat all matters raised in brief and by the record.

On March 31, 1972, a colored woman, Conyers Robinson, living in Columbus, Georgia, owned and operated a grocery store located at 1600 24th Street in Phenix City, Russell County, Alabama. She opened the store around 9:45 o'clock on the morning of March 31, 1972. About fifteen minutes later a black man walked into the store, pointed a pistol at her and asked her for her pocketbook. She turned around to get out of his way and he picked up her pocketbook. She ran out the front door of the store and screamed. She saw the man come out with her pocketbook tucked under his arm and he ran down the street. She was very close to the man, within three feet, when he pointed the pistol at her and she got a good look at him. She had five silver dollars in her pocketbook and an undetermined amount of money she had collected for the choir of her church.

She testified the man had on a knitted cap—either blue or black, with white rings around it and with a bib. He also was wearing dark shades (sunglasses) with something like a small piece of netting or stocking partially across the sunglasses.

Two people, Belinda Lattimore and Tommy Morgan, heard the robbery victim scream and they saw the man come out of the store with the pocketbook under his arm and run down the street.

Shortly before the time of the robbery, a Phenix City police officer, while on routine patrol, observed a 1965 red Mustang automobile parked on a street about three blocks from the grocery store in question. The car was parked in a sparsely populated area of Phenix City near a wooded area. The car did not appear to be disabled and the officer decided to check the tag registration. The tag number on the car was BJB 157 and was a Georgia tag issued in Columbus to Major Poole, Jr., living at the Elizabeth Canty Apartments in Columbus, Georgia. This officer heard about the robbery on his police radio. He, in turn, radioed the police officer assigned to investigate the robbery and related to him all the information he had learned in checking out the red Mustang.

In early August, 1972, Major Poole, Jr., and two other males were picked up at a car lot in Phenix City. They were observed walking around inside the car lot and close to the gate. At that time the lot was closed to the public. It was early in the morning. All three were arrested and charged with loitering in violation of an ordinance of the City of Phenix City. On the date set for trial in the Municipal Court, the officer who had been in charge of the robbery investigation since March 31, 1972, and who had been trying to locate Major Poole, Jr., for questioning in connection with the robbery, carried Conyers Robinson, the victim, Belinda Lattimore and Tommy Morgan to the Municipal Court. They were told that the purpose in carrying them to the Municipal Court was to see if they recognized anyone who was involved in the robbery. Mrs. Robinson was sitting next to the police officer on a bench in the courtroom located about in the middle of the courtroom. Lattimore and Morgan were seated on a different row. There were a number of male blacks in the courtroom that morning. These witnesses had not been told that Major Poole, Jr. was the robbery suspect, nor were they told that he would be in the Municipal Courtroom on this occasion. When Poole and the other two men were called before the Municipal Court Judge and before Poole was identified by name, Mrs. Robin-

son and Tommy Morgan positively identified Poole as the man who robbed Mrs. Robinson on the morning of March 31, 1972. Lattimore said she could not be positive but in her opinion Poole was the robber. Following this court encounter, Mrs. Robinson signed a warrant charging Poole with robbery.

Following a preliminary hearing, Poole was bound over for grand jury action.

At trial in the court below Robinson and Morgan made positive in-court identifications of appellant as the man who robbed Mrs. Robinson of her pocketbook at gun point. The other witness, Lattimore, testified that in her opinion appellant was the man she saw leaving Mrs. Robinson's store with a pocketbook under his arm.

Appellant set up an alibi defense which was supported by his testimony and that of his wife. He testified that he got out of bed at his apartment located at 302 F Elizabeth Canty Apartments in Columbus, Georgia, around 8:45 o'clock on the morning of March 31, 1972, and went down stairs and prepared his breakfast. He left his wife in bed. While preparing his food, he heard a knock on the door. When he opened the door he found a friend of his named Bo Carter. Carter asked to borrow his 1965 red Mustang car to pick up some girls at school. He further testified that he loaned the car to Carter with the understanding that he would bring the car back not later than 10:30 A.M. as he had to carry his wife to the clinic at a local hospital. Carter assured him that he would be back at the appointed hour. Bo Carter was dead at the time of appellant's trial.

Appellant's wife testified that when she got up her husband was in the apartment and was not dressed. She noticed the car was not parked at the apartment and she asked her husband about the car, stating she had to go to the hospital. Appellant told her that he had loaned the car to Bo Carter under an agreement that he would bring the car back in time for her to go to the hospital. When the car was not back at the apartment at 10:30 A.M., she and her husband got into an argument about

the car. She got dressed and caught a bus to go to the clinic and left her husband still undressed.

Appellant claimed that Bo Carter did not return with his car until sometime after twelve o'clock stating he had battery trouble. At 2:30 P.M. appellant drove the car to the Medical Center to pick up his wife. His wife left before he arrived at the hospital. He saw Janice Flakes, a granddaughter of Mrs. Robinson with whom she lived. Janice asked him for a ride home and he carried her to Mrs. Robinson's home. He stated he had been to Mrs. Robinson's home a number of times but never when she was at home and he had never met her.

Appellant further testified he had heard that Mrs. Robinson ran a store in Phenix City but he had never been to the store and did not know where it was located. In short, he denied the robbery.

While in jail in Phenix City awaiting trial on the robbery charge, he escaped. He jumped from a bridge into the river which separates Phenix City from Columbus, Georgia. He claimed he escaped from the jail so that he could employ a lawyer. He employed a lawyer in Phenix City and voluntarily returned to the jail.

Appellant was given the *Miranda* warnings in connection with the robbery charge and signed a waiver. He did not make or sign a statement about the robbery. On cross-examination appellant admitted some prior felony convictions.

Appellant produced two witnesses who testified to his good character and stated that they would believe him on oath notwithstanding his felony convictions.

Appellant was separated from the service in January prior to his arrest in August, 1972. He had no gainful employment from the time he was discharged from service up to the time of his arrest. He claimed he was drawing unemployment compensation.

At the conclusion of the state's case, appellant made a motion to exclude

on the ground that the state failed to make out a prima facie case. This motion was overruled. The evidence adduced by the state was sufficient upon which to base a verdict of guilt. The facts in the instant case are very similar to the facts in the case of Rhodes v. State, 50 Ala.App. 661, 282 So.2d 100. Appellant was viewed by one or more witnesses at close quarters, for several minutes, in the face without disguise, during daylight hours, and the in-court identification was positive and un-equivocal.

■ If an in-court identification is es-tablished by clear and convincing evidence based upon observations of the suspect then prior identification without counsel's presence does not constitute reversible er-ror. There was no lineup in this case. The in-court identification stemmed from an independent origin, a view in open court in another courtroom prior to arrest. White v. State, 48 Ala.App. 334, 264 So.2d 565; Hannon v. State, 48 Ala.App. 613, 266 So.2d 825; Shewey v. State, 48 Ala. App. 730, 267 So.2d 520.

Robbery is the felonious taking of goods from the person of another or in his pres-ence against his will by violence or by put-ting him in fear, and such violence must precede or accompany the stealing. Tun-still v. State, 33 Ala.App. 460, 34 So.2d 857; Hardis v. State, 28 Ala.App. 524, 189 So. 216; Parks v. State, 21 Ala.App. 177, 106 So. 218.

The trial court in his oral charge to the jury thoroughly covered every phase of the law applicable to this robbery conviction. He charged on the three constituent ele-ments of robbery—(a) felonious intent, (b) force or by putting in fear, and (c) by that means a taking and carrying away the per-sonal property of another from his person or in his presence.

The court fully charged the jury on the law respecting good character. He charged that evidence of good character was to be taken along with all the other testimony and if the testimony of good character and truthfulness, along with the other evidence, was sufficient to generate a reasonable doubt of his guilt, then the jury should acquit the defendant, even though the jury might have convicted him in the absence of good character testimony.

■ During the assistant district attor-ney's closing argument to the jury, he made reference to the good character evi-dence on behalf of appellant. The record reflects the following:

"THE COURT: I didn't hear the state-ment. The statement as of the date of the trial, the questions concerning good character and reputation had to be prior to the date of the charge.

"MR. FAULK: I want you to think about this and use your common sense. Judas was a man of good reputation im-mediately before betraying Christ.

"MR. POPE: We object to any refer-ence to Judas and Christ.

"MR. FAULK: That is exactly the same—

"THE COURT: Let me hear the objec-tion. All right, what was the objec-tion?

"MR. POPE: The objection is, your Honor, there has been no testimony as to Judas and Christ in this trial of this case, and it is improper to—

"THE COURT: I am going to overrule. I will let him argue his case."

Judas was the most despised man in Biblical history and the passage of centu-ries has only served to solidify that feeling in the hearts and minds of generations aft-er generations of peoples everywhere on the globe. No more opprobrious epithet, nothing more demeaning, degrading or de-basing can be imagined than to liken a hu-man being to Judas Iscariot.

The assistant district attorney transcend-ed all boundaries of legitimate argument in referring to Judas in connection with ap-pellant and his good character evidence, and committed prejudicial error which er-

ror was approved and sanctioned by the trial court when he overruled appellant's objection to such argument. We think it clear enough, the jury was authorized to consider the ruling of the trial court as an argument against giving weight to proof of good character. We are persuaded reversible error is made to appear by the action of the trial court sanctioning the argument of state's counsel and that appellant is due a new trial. Mosley v. State, 241 Ala. 132, 1 So.2d 593. See also Travis v. Hubbard, 267 Ala. 670, 104 So.2d 712, headnotes 4 and 5.

This cause is reversed and remanded. Appellant will remain in custody until discharged by due course of law.

Reversed and remanded.

ALMON and TYSON, JJ., concur.

DeCARLO, J., dissents.

CATES, P. J., not sitting.